# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DENISE KAY JONES,**

        **Plaintiff,**

    **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

**Case No. 2:17-cv-339**
**Judge Michael H. Watson**
**Magistrate Judge Elizabeth P. Deavers**

## REPORT AND RECOMMENDATION

Plaintiff, Denise Kay Jones, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 11) and the administrative record (ECF No. 9-7). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I. BACKGROUND

Plaintiff filed her application for benefits on September 3, 2013 with an alleged onset date of June 1, 2009. (R. at 98-99, 130-131 & 205-239.) Plaintiff alleges disability from back problems and high blood pressure. (R. at 80.) Plaintiff's applications were denied initially and upon reconsideration. (R. at 132-138, 141-145.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 146.)

Administrative Law Judge Paul D. Sher (the "ALJ") held a hearing on January 11, 2016, at which Plaintiff, represented by counsel, appeared and testified. (R. at 35-79.) Vocational Expert Mary Everts (the "VE"), also appeared and testified. (R. at 72-78.) On February 3, 2016,

the ALJ issued a decision finding that the Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 14-29.)  On February 21, 2017, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-3.)  Plaintiff then timely commenced the instant action.  (ECF No. 1.)

## II.    HEARING TESTIMONY

### A.  Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that she lives in a mobile home without stairs and that she is separated and lives with her seventeen-year-old son.  (R. at 41-42.)  Plaintiff also testified that her only source of income is her son's social security insurance and child support.  (R. at 42.)  Plaintiff further testified that she has a driver's license and has a car but does not drive outside of her town due to back and leg pain.  (R. at 43.)  Plaintiff stated that she is able to ride in a car as a passenger and that her daughter took her to the administrative hearing, approximately one hour and fifteen minutes from her home.  (R. at 43-44.)

Plaintiff testified that she last tried to work in 2014 but could not handle the lifting and standing required by the warehouse position.  (R. at 44-45.)  Plaintiff also testified that she worked part-time as a sales person in 2012.  (R. at 45.)  Prior to that, Plaintiff worked at a print shop at a front desk position that required her to sit for four hours total, stand for four hours total, and lift between twenty and thirty pounds at a time.  (R. at 46.)

Plaintiff told the ALJ that she stopped working full-time in 2005 because of back pain, anxiety, and depression.  (R. at 48.)  Plaintiff stated that she started physical therapy two weeks before the administrative hearing because she could not get a doctor's referral earlier.  (R. at 50.)

Plaintiff also stated that she is not a candidate for pain management injections because she suffers from blood clots.  (R. at 51.)

Plaintiff testified that she begins household chores and her son finishes them for her.  (R. at 51.)  According to Plaintiff, she can vacuum up to ten minutes at a time before she has to stop.  (R. at 52.)  Plaintiff stated that she takes baths because she cannot stand long enough to take a shower.  (R. at 53.)  Plaintiff also stated that her son helps her out of the bath because she experiences numbness in her right leg three to four times daily that she fears will cause her to fall.  (*Id*.)  Plaintiff also testified that her mother visits three or four times monthly to help her clean the house.  (R. at 51-52.)  According to Plaintiff she can stand and sit for up to thirty minutes at a time each.  (R. at 54.)  Plaintiff testified that she and her son normally prepare frozen meals.  (R. at 55.)  Plaintiff told the ALJ that her son helps her do the laundry because she can't bend over to get clothes out of the dryer.  (R. at 56.)

Plaintiff testified that she used to go camping frequently, but her anxiety has prevented her from going in the last three years.  (R. at 55.)  According to Plaintiff, "[j]ust going out of the house gives me anxiety."  (*Id*.)  Plaintiff also testified that she has a bipolar diagnosis and cannot maintain concentration to watch a movie for more than fifteen minutes.  (R. at 69-70.)  Plaintiff stated that she goes grocery shopping with her son once a month and that she does not go anywhere alone.  (R. at 55-56.)  Plaintiff also stated that she is on sleep medication and wakes up every two hours because of pain.  (R. at 58.)  According to Plaintiff, she gets between four and six hours of sleep nightly and lies down due to pain for two to three hours in total daily.  (*Id*.)

Plaintiff testified that she needs up to ninety minutes to get out of bed in the morning because of back and leg pain.  (R. at 60.)  According to Plaintiff, she then watches television,

3

starts laundry, and tries to do some cleaning, but usually lies down on the couch because of her back and leg pain.  (*Id*.)  Plaintiff stated that she sits or lies down most of the day, uses the internet on her phone, occasionally talks to her mother and daughter on the phone, and rarely sees her neighbors.  (R. at 60-62.)

Plaintiff testified that she does not use a back brace or cane but that she does use a tens unit and heating pad.  (R. at 59-60.)  Plaintiff also testified that, due to her blood clots, she has to elevate her legs when sitting or lying down.  (R. at 64.)  Plaintiff further testified that her pain is a seven on a scale of ten and that her medications lower its intensity to a five.  (R. at 67.)  Plaintiff also stated that her current medications have helped lessen the frequency of her panic attacks.  (R. at 71.)

## B.  The VE's Testimony

At the hearing, the VE stated that he determined that Plaintiff has past relevant work as a a dispatcher, a semi-skilled job at the sedentary exertional level and sales clerk, a semi-skilled job performed at the medium exertional level.  (R. at 73.)  The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE.  (R. at 74-78.)  Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could not perform her previous work.  (R. at 74.)  The VE testified that such a hypothetical person, with limitations to light work, could engage in work as an inspector, a light, unskilled job, or assembler, a light, unskilled job that both exist in the state and national economy.  (R. at 75-76.)

### III.  MEDICAL RECORDS

**A.  Mount Carmel East**

On July 8, 2011, Plaintiff visited the Mount Carmel East emergency room complaining of back pain resulting from being "thrown down" by her brother.  (R. at 354.)  Upon exam, Plaintiff displayed "[s]ome diffuse tenderness distally with no obvious deformity or bruising or redness or swelling.  No flank or CVA tenderness. . . .  Straight leg raise is negative bilaterally."  (*Id*.)  Plaintiff underwent three lumbar vertebrae x-rays, which showed "no evidence of fracture, prevertebral swelling, or subluxation."  (*Id*.)  The treating physician noted that her surgical hardware appeared intact and that Plaintiff showed some degenerative changes.  (*Id*.)  He diagnosed a contusion and strain of the lower back.  (R. at 355.)  Dr. Karl C. Fahrbach read Plaintiff's x-rays, found "no acute fracture or subluxation," and concluded that Plaintiff has intact surgical hardware, no acute abnormality, and no significant degenerative change.  (R. at 356.)

**B.  Dublin Methodist Hospital**

On October 10, 2011, Plaintiff visited Dublin Methodist Hospital.  (R. at 361.)  Upon exam, Plaintiff displayed a full range of motion in all extremities, no tenderness or swelling, and no joint deformities.  (R. at 362, 372.)  The examining nurse found unrestricted range of motion in all extremities and appropriate muscle tone, strength, and fine motor movement.  (R. at 370.)  On February 24, 2012, Plaintiff again visited Dublin Methodist Hospital.  (R. at 391.)  The examining nurse found appropriate muscle tone, strength, and fine motor movement, with no report of muscle weakness.  (R. at 392.)  Upon exam, Plaintiff displayed full range of motion in all extremities.  (R. at 394.)

Plaintiff returned to Dublin Methodist Hospital on May 14, 2012. (R. at 415.) The attending nurse observed a full range of motion in all extremities, appropriate muscle tone, strength, and fine motor movement, and no report of muscle weakness. (R. at 416.)

Plaintiff again visited Dublin Methodist Hospital on October 16, 2012, complaining of back and neck pain with numbness and tingling in her right leg after her boyfriend grabbed her, pushed her down, and punched her in the right eye. (R. at 429.) The attending clinician found that Plaintiff "ambulates without difficulty and has no extremity weakness." (R. at 431.) He also found no acute fracture or subluxation in the cervical spine and mild multilevel degenerative disc disease. (R. at 432.) The attending nurse observed a full range of motion in all extremities, appropriate muscle tone, strength, and fine motor movement, and no report of muscle weakness. (R. at 430.)

## C. Adena Health System

On September 23, 2013, Plaintiff visited Adena Health System complaining of increased back pain after lifting and moving furniture the prior three days. (R. at 467.) X-rays indicated intact surgical hardware and no fracture, dislocation, or other osseous abnormality. (R. at 468, 470.) On October 14, 2013, Plaintiff again visited Adena Health System complaining of an injury to her right shoulder. (R. at 484.) Upon exam, Plaintiff showed full range of motion in her neck, moderate tenderness and limited range of motion due to pain in her right shoulder, and no other extremity symptoms. (R. at 485.) Plaintiff showed limited lumbar range of motion and some soft tissue tenderness. (*Id*.) Plaintiff showed normal reflexes, with no motor deficit and no sensory deficit. (*Id*.) The attending physician diagnosed a sprained right shoulder, right-side lumbar radiculopathy, and multiple contusions to the chest and right shoulder. (*Id*.) He

prescribed a sling, rest, Vicodin, Naproxen, and Flexeril.  (R. at 485-486.)  Imaging results showed no acute abnormality of the right shoulder, no acute abnormality of the lumbar spine, and a stable postsurgical lumbar spine.  (R. at 496-498.)

On November 10, 2013, Plaintiff returned complaining of moderate lower lumbar pain exacerbated by bending over.  (R. at 487.)  The attending physician found full range of motion in Plaintiff's neck; muscle spasm, soft tissue tenderness, and limited range of motion in her back; and, normal extremity range of motion.  (R. at 487-488.)  He prescribed rest, Robaxin, Tylenol, and Prednisone.  (R. at 488.)

On March 31, 2014, Plaintiff again visited Adena Health System complaining of lower lumbar back pain caused by picking up boxes.  (R. at 489.)  Upon exam, Plaintiff showed a normal back and extremities, and the attending physician diagnosed acute back pain arising from a lumbar strain.  (R. at 490.)  Plaintiff also demonstrated normal reflexes, with no motor or sensory deficit.  (*Id*.)  He prescribed rest, Flexeril, and Percocet.  (*Id*.)  Imaging results showed a stable postsurgical lumbar spine and no acute bony abnormality.  (R. at 492.)  On October 6, 2015, Plaintiff again visited Adena Health System.  (R. at 827.)  Upon exam, Plaintiff demonstrated a "normal gait" and no weakness or sensory abnormalities.  (*Id*.)

On November 20, 2015, Plaintiff visited Adena Health System.  (R. at 840.)  Plaintiff reported no back or neck pain, headache, weakness, or numbness.  (*Id*.)  Upon examination, Plaintiff displayed full range of motion in her extremities, some tenderness, and no joint swelling.  (R. at 841.)  Upon expanded examination, Plaintiff displayed full range of motion in her hips without tenderness and full range of motion in her knees with tenderness and some pain, but without swelling, deformity, or crepitus.  (*Id*.)  Plaintiff also displayed a normal lower leg

profile without tenderness or swelling.  (R. at 842.)  The attending certified physician's assistant observed a "normal" gait.  (*Id*.)  The radiologist read imaging results of Plaintiff's right knee and found them to be "normal, negative, no acute abnormality."  (R. at 843.)

### D.  Glenn Iben, M.D.

On January 7, 2014, Plaintiff saw Dr. Iben complaining of depression, frequent urination, and hip pain.  (R. at 478.)  Plaintiff reported joint swelling, hip, knee, back, and shoulder pain, as well as morning stiffness.  (R. at 478.)  Dr. Iben instructed Plaintiff to cut down on her smoking and continue her medication.  (R. at 479.)

On March 10, 2014, Plaintiff again saw Dr. Iben complaining of depression, anxiety, fatigue, frequent urination, and hip pain.  (R. at 480.)  Dr. Iben again counseled Plaintiff to reduce smoking and continue her medications.  (R. at 481.)  On March 24, 2014, Plaintiff visited Dr. Iben again with the same complaints, and he gave her the same instructions.  (R. at 482-483.) On May 1, 2014, Plaintiff again visited Dr. Iben for the same complaints, and he made the same recommendations.  (R. at 501-502.)

On September 15, 2014, Plaintiff visited Dr. Iben complaining of knee pain, insomnia, fatigue, hip pain, depression, anxiety, and frequent urination.  (R. at 547.)  Dr. Iben instructed Plaintiff to improve her diet, cut down on smoking, and continue her medications.  (R. at 548.) On September 16, 2014, Plaintiff saw Dr. Iben for a follow-up, and Dr. Iben gave her the same instructions.  (R. at 549-557.)  On October 7, 2014, Plaintiff returned with similar complaints. (R. at 558.)  Dr. Iben found a "normal gait" and gave her the same instructions.  (R. at 559-560.) On October 31, 2014, Dr. Iben again saw Plaintiff, found a "normal gait," and instructed her to

improve her diet, cut down on smoking, and continue her medications. (R. at 561-562.) Dr. Iben referred Plaintiff to pain management. (R. at 562.)

On December 3, 2014, Dr. Iben again saw Plaintiff, who complained of fatigue lower back pain, depression, headache, insomnia, knee pain, hip pain, anxiety, and frequent urination. (R. at 564.) Dr. Iben found a "normal gait and recommended an improved diet, decreased smoking, and continued medications. (R. at 564-565.) On December 30, 2014, Dr. Iben saw Plaintiff for similar complaints, observed a "normal gait," an ordered a series of x-rays. (R. at 568.) Dr. Iben instructed Plaintiff to improve her diet, reduce her smoking, and continue her medications. (R. at 569.) On January 28, 2015, Plaintiff visited Dr. Iben for similar complaints. He observed a "normal gait" and repeated his previous instructions. (R. at 570-572.) Dr. Iben saw Plaintiff again on February 24, 2015, for similar complaints, observed a "normal gait," and gave Plaintiff the same instructions. (R. at 573-575.)

On March 24, 2015, Plaintiff visited Dr. Iben complaining of low energy, back pain, insomnia, depression, lower back pain, bipolar disorder, fatigue, headache, knee pain, hip pain, anxiety, and frequent urination. (R. at 576.) Dr. Iben observed a "normal gait" and instructed Plaintiff to improve her diet, reduce smoking, and continue her medications. (R. at 577-578.) On April 30, 2015, Plaintiff returned once more to Dr. Iben with similar complaints. (R. at 579.) Dr. Iben observed a "normal gait" and repeated his previous instructions. (R. at 580-581.) On May 8, 2015, Dr. Iben again saw Plaintiff for similar complaints, observed a "normal gait," and instructed Plaintiff to improve her diet, reduce her smoking, and continue her medications. (R. at 582-584.)

On June 12, 2015, Plaintiff visited Dr. Iben again complaining of lower back pain, low energy, depression, bipolar disorder, fatigue, headaches, hip pain, anxiety, and frequent urination. (R. at 585.) Dr. Iben noted a "normal gait" and recommended that Plaintiff improve her diet, reduce her smoking, and continue her medications. (R. at 587.) On July 6, 2015, Plaintiff again visited Dr. Iben with similar complaints. (R. at 588.) Dr. Iben observed a "normal gait" and directed Plaintiff to improve her diet, reduce her smoking, and continue her medications. (R. at 589-590.) Plaintiff returned on August 3, 2015, with similar complaints. (R. at 591.) Dr. Iben again noted a "normal gait" and gave Plaintiff the same instructions. (R. at 592-593.) On August 10, 2015, Plaintiff again visited Dr. Iben with similar complaints. (R. at 594.) Specifically, Plaintiff reported joint swelling and pain in her right hip, right knee, left hip, left shoulder, right shoulder, back, and morning stiffness. (R. at 595.) Dr. Iben observed a "normal gait" and repeated his previous instructions. (R. at 595-596.)

On August 10, 2015, Dr. Iben also completed a medical source statement of Plaintiff's physical ability to do work-related activities. (R. at 504-509.) Dr. Iben opined that Plaintiff would be limited to occasionally lifting or carrying up to ten pounds; sitting, standing, or walking one hour at a time and no more than one hour per day; and, working no more than four hours per day. (R. at 504-505.) Dr. Iben also opined that Plaintiff can never reach, push, or pull with her hands; climb stairs, ladders, or scaffolds; balance, crouch, or crawl; or, be exposed to unprotected heights, moving mechanical parts, dust, fumes, odors, pulmonary irritants, extreme cold, heat, or vibrations. (R. at 506-508.) Dr. Iben further found that Plaintiff can occasionally stoop or kneel. (R. at 507.)

Plaintiff returned to see Dr. Iben on August 31, 2015, complaining of lower back pain, headaches, anxiety, depression, low energy, insomnia, bipolar disorder, hip pain, and frequent urination. (R. at 598.) Dr. Iben observed a "normal gait" and recommended that Plaintiff improve her diet, reduce her smoking, and continue her medications. (R. at 599-600.) Plaintiff saw Dr. Iben again on September 29, 2015, with similar complaints. (R. at 601.) Dr. Iben again observed a "normal gait" and repeated his previous instructions. (R. at 602-603.)

## F. State Agency Review

On May 23, 2014, non-treating state agency medical consultant Abraham Mikalov, M.D., reviewed Plaintiff's record for the state agency pursuant to her application for benefits. Dr. Mikalov opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of six hours in an eight-hour workday, and sit approximately six hours in an eight-hour workday. (R. at 84.) Dr. Mikalov also opined that Plaintiff is unlimited in her ability to climb ramps and stairs, kneel, crouch, and crawl and that she can stoop, but only occasionally climb ladders, ropes, or scaffolds. (R. at 85.) Dr. Mikalov further opined that Plaintiff is unlimited in her ability to push and/or pull except for her limitations on lifting and carrying. (*Id*.) Dr. Mikalov opined that Plaintiff has no manipulative limitations. (*Id*.)

Upon reconsideration on May 23, 2014, non-treating state agency medical consultant Gerald Klyop, M.D., also reviewed Plaintiff's records. Dr. Klyop opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of six hours in an eight-hour workday, and sit approximately six hours in an eight-hour workday. (R. at 123-124.) Dr. Klyop also opined that Plaintiff could frequently

climb ramps/stairs, stoop, kneel, crouch and crawl but only occasionally climb ladders, ropes, or scaffolds. (R. at 124.) Dr. Klyop further opined that Plaintiff is unlimited in her ability to push and/or pull except for her limitations on lifting and carrying. (*Id*.) Dr. Klyop opined that Plaintiff has no manipulative limitations. (*Id*.)

## IV.    THE ADMINISTRATIVE DECISION

On February 3, 2016, the ALJ issued his decision. (R. at 14-29.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since June 1, 2009, the alleged onset date. (R. at 17.)

The ALJ found that Plaintiff has the severe impairments of lumbar degenerative disc disease, degenerative joint disease of the knee, arthritis of the hip, generalized anxiety disorder and/or post-traumatic stress disorder, and depression. (R. at 17.) The ALJ further found that

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
>
> 5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.)  Specifically, the ALJ noted relevant medical records in Plaintiff's exhibits and conluded "the record shows neither 'the inability to ambulate effectively nor the inability to perform fine and gross movements effectively,' as required by Listings 1.02 and 1.04."  (*Id.*) The ALJ concluded that "no acceptable medical source had mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination."  (*Id.*)

At step four of the sequential evaluation process, the ALJ found that Plaintiff had the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, [the ALJ] find[s] that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and can: occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, crouch, and crawl; occasionally operate foot or hand controls; never be exposed to hazards such as unprotected heights or dangerous moving machinery; frequently reah all directions; understand, remember, and carry out simple instructions; perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; interact frequently with supervisors and coworkers and occasionally with the general public; and alternate between sitting and standing every 30 minutes.

(R. at 20.)  In reaching this determination, the ALJ gave Dr. Iben's 2014 opinion evidence "little weight."  (R. at 23.)  The ALJ noted that Dr. Iben's opinion regarding Plaintiff's limitations conflicts with the objective medical evidence as a whole and is unsupported by his own treatment records.  (*Id.*)  The ALJ gave great weight to the state agency medical consultant's physical assessment at reconsideration because it reflected evidence received after the initial determination.  (R. at 24.)

# V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

14

## VI.  ANALYSIS

### A.  The ALJ's Weighing of the Medical Evidence

In her statement of errors, Plaintiff contends that the ALJ's RFC analysis is flawed. Specifically, Plaintiff argues that the ALJ improperly accorded Dr. Iben's treating source opinion evidence "little weight."  (ECF No. 10 at 6-11.)  In evaluating a claimant's case, the ALJ must consider all medical opinions that he receives.  20 C.F.R. § 416.927(c).  Medical opinions include any "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the [claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling

weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 f.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will

consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

In his opinion, the ALJ listed several *Wilson* factors that influenced his decision not to give Dr. Iben's 2015 treating source opinion controlling weight. The ALJ noted that, although "[Plaintiff] has decreased range of motion in the lumbar spine, it did not affect the claimant's gait or cause other neurological abnormalities, and thus does not support the opinion." (R. at 23.) The ALJ then cites to ten specific medical records that support this finding. (*Id*.) Indeed, the ALJ cites Dr. Iben's own findings, in addition to the observations of other medical sources, to show that his medical opinion evidence is inconsistent with his own findings. (*Id*.) Dr. Iben's treatment notes consistently show that, from at least September 2014 to November 2015, Plaintiff demonstrated a "normal gait" and no neurological abnormalities that would result in the opined limitations. (R. at 559, 561, 564, 568, 571, 574, 577, 580, 583, 586, 589, 592, 595, 599, 602.) A review of the record reveals that Dr. Iben's opinion evidence directly contradicts both his own treatment notes and the other objective evidence in this case, which is void of findings as severe as Dr. Iben's opined limitations. *See* 20 C.F.R. § 404.1527(c)(3)-(4) (requiring medical opinions be evaluated for supportability and consistency); *Driggs v. Astrue*, No. 2:11-cv-229, 2011 WL 5999036 at *6 (S.D. Ohio Nov. 29, 2011) ("[A]n ALJ may reject the opinion of a treating source 'where the treating physician's opinion is inconsistent with [his or her] own medical records.'") (internal cite omitted).

The Undersigned finds, therefore, that the ALJ properly applied the *Wilson* factors with respect to Dr. Iben's opinion evidence and that substantial evidence supports his conclusion.

**B. Listing § 1.04**

Plaintiff also maintains that the ALJ erred in evaluating Listing § 1.04. (ECF No. 10 at 11-16.) Plaintiff avers that the ALJ's analysis at step three was improperly cursory, leaving it impossible to determine upon what evidence the ALJ based his determination. (*Id.* at 15.)

"At step three of the evaluation process, it is the burden of the claimant to show that he [or she] meets or equals the listed impairment." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004). Accordingly, "[w]hen a claimant alleges that he [or she] meets or equals a listed impairment, he [or she] must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728. The United States Court of Appeals for the Sixth Circuit has emphasized that ALJ's are not subject to a "heightened articulation standard" in considering the listing impairments. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). Instead, the Court simply reviews whether substantial evidence supports the ALJ's findings. *See id.*

Listing § 1.04 specifically requires, in pertinent part

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. 404, Subpt. P, App. 1 § 1.04A.

In this case, the ALJ found that Plaintiff failed to meet or equal any of the musculoskeletal impairments within the listing requirements.  (R. at 18-20.)  The ALJ emphasized that no medical source recorded findings "equivalent in severity to the criteria of any listed impairment, individually or in combination."  (R. at 18.)

Substantial evidence supports the ALJ's finding that Plaintiff did not meet or equal the requirements of Listing § 1.04A.  Although Plaintiff maintains that evidence in the record documents "lumbar spine pathology, central canal stenosis, spondylosis, sciatic neuralgia, and limited range of motion," (ECF No. 10 at 13),  a review of Plaintiff's cited records reveals none of the pathologies required by the regulation.  Plaintiff's records fail to show nerve root or spinal cord compression, neuro-anatomic distribution of pain, motor loss with atrophy or muscle weakness, sensory or reflex loss, or positive straight-leg raising test results.  (R. at 412, 429, 442, 451, 464, 480, 484, 487-488, 492, 538, 549, 552, 592, 677, 843.)  The objective evidence in the record indicates that Plaintiff had normal sensory results and normal reflexes.  (R. at 485, 490, 827.)  The objective evidence also shows that Plaintiff experienced no muscle weakness or atrophy.  (R. at 370-371, 392, 416, 430-431, 827.)  Last, Plaintiff's straight-leg exams were negative.  (R. at 354.)

Finally, as to the ALJ's treatment of the record as a whole in his step three analysis, the Court notes that the U.S. Court of Appeals for the Sixth Circuit has declined to require more than "minimal reasoning at step three."  *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365 (6th Cir. 2014).  Furthermore, at step three, the regulations require only that the ALJ consider "the medical severity of your impairment(s)," rather than the stricter "good reasons" requirement that

governs evaluation of treating source opinions. *Id.*; *see* § 404.1520(a)(4)(iii). The ALJ directly

addressed the severity issue by considering reports of treating and examining physicians. (R. at

18.) Additionally, at step four, the ALJ discussed the medical records and testimony that support

his severity analysis. (R. at 20-27.) The Undersigned finds, therefore, that the ALJ properly

considered the severity of Plaintiff's impairment at step three. *Forrest*, 591 F. App'x at 365.

## VII.  CONCLUSION

In conclusion, from a review of the record as a whole, the Undersigned concludes that

substantial evidence supports the ALJ's decision denying benefits. Accordingly, the

Undersigned **RECOMMENDS** that the Commissioner of Social Security's decision be

**AFFIRMED** and Plaintiff's Statement of Errors be **OVERRULED**.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that

party may, within fourteen (14) days, file and serve on all parties objections to the Report and

Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex*

*Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 6, 2018                                         <u>      /s/ *Elizabeth A. Preston Deavers*</u>
                                                            ELIZABETH A. PRESTON DEAVERS
                                                            UNITED STATES MAGISTRATE JUDGE